UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BLANCHITA PORTER, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 09-cv-1157 (RCL) |
| HON. JOHN MCHUGH,[1] Secretary of the Army and Walter Reed Army Medical Center, | ) ) ) ) ) | |
| Defendants. | ) ) | |

# MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiffs, Blanchita Porter and her siblings, bring this medical malpractice claim pursuant to the Federal Tort Claims Act, 28 U.S.C. 1346(b), against defendants, Walter Reed Army Medical Center ("WRAMC") and the United States Army. Plaintiffs are the surviving children and adult heirs to Blanche Porter ("Blanche"). Plaintiffs allege that during Blanche's 1995 hospital stay at WRAMC, the defendants negligently used restraints on Blanche and administered the drug Dilantin to her. Plaintiffs additionally allege that these actions caused Blanche to suffer, *inter alia*, speech loss, memory loss, mental anguish, and impairment of bodily functions until her death in 2001. Defendants moved for summary judgment, arguing that plaintiffs have failed to establish an applicable standard of care with regard to both allegations. Defs.' Mot. [19]. For the reasons stated herein, this motion will be GRANTED.

## II. BACKGROUND

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Mr. McHugh, in his official capacity as Secretary of the Army, is automatically substituted as the named defendant.

Blanche was the spouse of an Army retiree and therefore entitled to receive medical treatment at Walter Reed Medical Center. Defs.' Mot. at 2. Blanche suffered from progressive dementia and began exhibiting symptoms of dementia in the early 1990s. Defs.' Statement of Material Facts at 1.

On December 20, 1994, Blanche's private physician, Dr. Duvall, began treating her with Dilantin, an anti-seizure drug, in response to her repeated syncope (loss of consciousness) spells. *Id.* at 2. At this time, Blanche was 82 years old. Eight days later, Blanche's daughter called Dr. Duvall and informed him that her mother appeared "zombie-like." *Id.* Dr. Duvall recommended Blanche be taken to the hospital. *Id.* Upon arrival at WRAMC, Blanche's treatment with Dilantin was discontinued. *Id.* at 3. Blanche's discharge diagnosis read "decreased sensorium due to Dilantin." *Id.*

On October 23, 1995, Blanche was admitted to the Emergency Room at Washington Adventist Hospital due to a syncope spell, decreased responsiveness, and altered mental status. *Id.* During her treatment at Washington Adventist, Blanche received results from a blood culture test that showed positive for bacteria. *Id.* at 4. On October 28, 1995, Blanche was admitted to WRAMC's Emergency Room for evaluation of mental status changes and the positive blood culture test. Defs.' Mot., Ex. A.[2]

After being admitted to WRMAC, restraints were used to secure Blanche to her bed. *Id.* at 4-5. When Blanche's daughter observed her mother in the restraints, she requested the hospital discontinue using them. *Id.* at 5. The hospital complied with this request. *Id.* On October 31, 1995, the physicians began administering Dilantin to Blanche in response to the

---

[2] To the extent plaintiffs argue that Blanche was not admitted due to mental status changes, the oppositions to summary judgment falls short of creating a dispute of fact. As evidence to show a factual dispute, plaintiffs merely point out that this fact was not provided in the original complaint. This conclusory assertion does not create a factual dispute.

concern that she was at risk for complications resulting from seizure-induced ischemia (restriction in blood supply to tissues). *Id.* at 6. After being alerted to Blanche's prior adverse reaction to Dilantin, the physicians discussed whether to stop administering the drug because of presumed lethargic effects it had on her. *Id.* The physicians decided not to discontinue use at that time. *See id.*

On November 3, 1995, Blanche developed a fever. *Id.* Due to the possibility that the fever was drug-induced, Blanche's physicians discontinued all of the medications she had been on for the past six days, including Dilantin. *Id.* Blanche's neurologist noted his concern with the decision to stop administering Dilantin due to her continued high risk of seizures and past CT scans. *Id.* at 7. On November 10, 1995, Blanche's fever subsided. *Id.*

Blanche was discharged from the hospital on November 22, 1995. *Id.* at 8. Following her discharge, Blanche resided with her daughter. *Id.* On February 19, 2001, Blanche died due to pneumonia. *Id.*

On September 9, 1997, plaintiffs submitted an administrative claim on behalf of their mother under the Federal Tort Claims Act, asserting that Blanche was given "one or more improper drugs, including Dilantin, that caused her to go into a coma and become permanently incapacitated." Pls.' Opp'n at 3. After spending eleven years in the administrative process, plaintiffs filed the present lawsuit on June 24, 2009. *Id.* In their complaint, plaintiffs assert that, by using restraints and administering Dilantin, defendants "failed and neglected to provide proper medical treatment" to Blanche. Compl. ¶¶ 27-29.

### III.   ANALYSIS

#### A.   Standard of Review

As a general matter, a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial. Fed. R. Civ. P. 56(c). To ascertain whether an issue involves "material" facts, a court must look to the substantive law on which the claim or defense rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ." *Id.* at 255. Yet "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252. This standard is " 'very close' to the 'reasonable jury' directed verdict standard," and despite their distinct procedural postures, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250-51.

### B.     Plaintiffs Fail to Establish A Standard of Care

"The plaintiff in a medical malpractice case bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1244 (D.C. 1997) (citation and internal quotation marks omitted). "Each of these elements must usually be proved by expert testimony." *Id.* (citing *Cleary v. Group Health Ass'n*, 691 A.2d 148, 153 (D.C. 1997)) ("Generally, in a medical malpractice

negligence action, the plaintiff must present medical expert testimony to establish the standard of care, expert testimony that the defendant's conduct deviated from that standard of care, and expert testimony establishing that the alleged deviation proximately caused the plaintiff's injuries").

"The personal opinion of [a] testifying expert as to what he or she would do in a particular case . . . is insufficient to prove the applicable standard of care." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C. 2006) (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)). Rather, the testifying expert must establish that the relevant standard of care is followed nationally, "either through reference to a published standard, discussion of the described course of treatment with practitioners outside the District at seminars or conventions, or through presentation of relevant data." *Strickland*, 899 A.2d at 773-74 (internal punctuation and citations omitted); *Snyder v. George Washington Univ.*, 890 A.2d 237, 241 n. 3 (D.C. 2006) (standard of care "testimony must reflect some evidence of a national standard, such as attendance at national seminars or meetings or conventions, or reference to published materials, when evaluating a medical course of action or treatment"). Further, an expert's educational and professional background is not sufficient to demonstrate that he is familiar with the national standard of care. *Strickland*, 899 A.2d at 774; *Nwaneri v. Sandidge*, 931 A.2d 466, 467 (D.C. 2007) ("Dr. Woratyla's expertise in the field of vascular surgery, standing alone, without specific testimony or evidence in the record establishing the basis for his knowledge of the national standard of care . . . was insufficient to lay the proper evidentiary foundation to allow Dr. Woratyla to give expert opinion testimony that appellant deviated from the standard of care"). Where the expert makes "no attempt to link his testimony to any certification process, current

literature, conference or discussion with other knowledgeable professionals," there is no "basis for his discussion of the national standard of care." *Strickland*, 899 A.2d at 774.

The plaintiffs allege medical malpractice under two theories.  First, that the defendants negligently used restraints on Blanche.  Second, that the defendants administered the drug Dilantin to Blanche notwithstanding her previous adverse reaction to the drug.  With respect to the first theory, plaintiffs' expert witness plainly states that he has no opinion as to the standards for the use of physical restraints on patients in 1995.  *See* Defs.' Mot. Ex. D at 8-9.  It is generally recognized that expert testimony is needed to establish that there was a deviation from the national standard of care.  *Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1244 (D.C. 1997).  Additionally, the D.C. Court of Appeals has concluded that expert testimony is needed to determine whether the attending physicians correctly prescribed restraints to a patient.  *Wash. Hosp. Ctr. v. Martin*, 454 A.2d 306, 308 (D.C. 1982) ("[t]hose are matters which generally involve professional judgment and skill, and if the exercise of such judgment and skill is at issue, expert testimony would no doubt be needed[.]").  Thus, although plaintiffs attempt to bypass the need for an expert opinion by citing to guidelines on the use of restraints by the Food and Drug Administration and the Joint Commission on Accreditation of Healthcare Organizations, these attempts fall short of establishing a clearly defined national standard of care.  Accordingly, the Court grants the defendants' motion for summary judgment on the plaintiffs' use of restraints negligence theory.

As to the second theory, plaintiffs' expert fails identify any standard of care for the administration of Dilantin.  Plaintiffs' expert merely states his personal opinion about the use of Dilantin on Blanche:

> I have the opinion that a spell considered consistent with a seizure
> occurred that led the staff to start her on the drug Dilantin, a drug

>to which she had previously had a significant adverse reaction and should not have been used at that point.
>
>I have the opinion that there are other seizure drugs that could have easily been used.

*See* Defs.' Mot. Ex. C at 38.  Because the expert's opinion is not supported by any medical literature and does not reference a standard of care, it must be treated as his personal, inexpert opinion. *Burton v. United States*, 668 F. Supp. 2d 86, 100 (D.D.C. 2009) (Lamberth, J.) (citing *Nwaneri*, 931 A.2d at 470).  As already outlined by the Court, a testifying expert's personal opinion by itself is insufficient to prove the applicable standard of care. *Strickland*, 899 A.2d at 773.  Thus, the Court grants the defendants' motion for summary judgment with respect to the plaintiffs' Dilantin negligence claim.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS the defendant's motion [19] for summary judgment.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 27, 2012.